TONY WILLIS on behalf of himself and
the HEIRS OF AMELIA VA, Plaintiff

v.

FAI`IVAE GALEA`I and FAI`IVAE FAMILY, TO`OMATA
M.T. TUITELE, CHIEFS OF LEONE VILLAGE, SUAPA`IA
ANETERE`A, PIO LE`OSO and SE`E LE`OSO, Defendants

SA`AGA LEVI on behalf of himself and the
HEIRS OF AFELE LEVI, Plaintiff/Intervenor

WILLIAM AH KUOI, Defendant/Intervenor

121

PAT M. GALEA`I, Defendant/Intervenor

OLO LETULI, Defendant/Intervenor

SUAFO`A VELIO, Defendant/Intervenor

PIO SAGOTE on behalf of himself and
the SAGOTE FAMILY, Defendant/Intervenor

PULETU M. MEREDITH, Defendant/Intervenor

TAELEIFI MANE, Defendant/Intervenor

TONY WILLIS and VAETOIFAGA D. ASUEGA
on behalf of themselves and the HEIRS OF
AMELIA VA, Plaintiffs/Objectors

v.

FAI`IVAE FAMILY and MAUOLEFALE P.
SALAVE`A, Claimants/Defendants

TO`OMATA M.T. TUITELE, AVEGALIO FAMILY,
LE`ALAIALOA FAMILY, AIGAMAUA FAMILY,
CHIEFS AND TALKING CHIEFS OF LEONE, FAI`IVAE
GALEA`I, TAELEIFI A. RIPLEY, and
FAILAUTUSI AVEGALIO, Plaintiffs/Objectors

v.

DOROTHY V. ASUEGA on behalf of the HEIRS OF
AMELIA VA TALAMAIVAO, Defendant/Claimant

TONY WILLIS, Plaintiff

v.

SU`A of the Village of Auma, ETUALE & SONS
of the Village of Auma, and DOES I through X,
Defendants

TUITELELEAPAGA NAPOLEONE, Plaintiff

v.

TONY WILLIS, Defendant

122

LUCY UO AH CHING, EUGENE UO, EDWARD UO, and EMILE UO for the UO FAMILY, Plaintiffs

v.

AMOS GALEA`I and FAI`IVAE GALEA`I, Defendants

High Court of American Samoa
Land & Titles Division

LT No. 45-81
LT No. 45-82
LT No. 8-84
LT No. 22-86
LT No. 6-87

March 21, 1989

Before REES, Associate Justice, and AFUOLA, Associate Judge.

Counsel: For Ah Kuoi, Edwin Gurr
 For Avegalio, Aigamaua, and Le`alaialoa, Aitofele Sunia
 For Fai`ivae Family, Fai`ivae Galea`i
 For Levi Family, Enere H. Levi
 For Meredith, Isa-Lei Iuli
 For Suapa`ia and Uo, Albert Mailo
 For To`omata and Tuitele, Tau`ese P. Sunia
 For Tuiteleleapaga, Aviata Fa`alevao
 For Willis, Charles Ala`ilima

On Motion for Reconsideration:

These consolidated cases concern title to various lands in and around the village of Leone, all claimed to be parts of land called "Lega`oa."

Le ga`oa means "the flat land." Litigants Tony Willis, Dorothy V. Asuega, and Sa`aga Levi--- hereinafter referred to as "plaintiffs," although their posture varies from case to case --- maintain that Lega`oa once consisted of all the flat land in the valley that includes Leone, from the ocean to the mountains.

Plaintiffs contend that Lega`oa was once the individual property of Talamaivao Lei, a chief from `Upolu, and that Talamaivao gave it to his wife Amelia Va and two of her relatives, To`omata and Tali. They further contend that two High Court decisions in 1906 and 1918 effectively divided the flat land in the Leone valley into two parts, the seaward half belonging to the chiefs of Leone and the mountain side to Va, Tali, and To`omata as tenants in common. Finally, they maintain that after the 1906 decision there was a "compromise," under which Va, Tali, and To`omata (or perhaps Va alone) received the mountain slopes surrounding the back half of the valley.

Plaintiffs have submitted for registration a survey, claimed to be a retracing of a survey

124

prepared for To`omata in 1906. (The latter survey was described on its face as containing 297 acres and is hereinafter referred to as "the 297-acre survey," although evidence adduced at trial suggests this figure may not be exactly accurate.) Plaintiffs say their survey reflects the land awarded to Amelia Va, To`omata, and Tali in the 1906 High Court decision and the subsequent "compromise."

Most of the other parties (hereinafter "defendants") are chiefs of Leone or members of families appertaining to the village of Leone. They claim that they and their ancestors have occupied the land in question since the memory of man runneth not to the contrary; that Talamaivao, his legatees, and their descendants were never "residents or citizens or tagata moni of Leone"; that insofar as the High Court ever awarded anything to Amelia Va and her relatives, it must have been a relatively small tract toward the mountains that has long been occupied by descendants of these people, including plaintiff Tony Willis; and that insofar as the Va people ever had title to other lands, such title has been superseded by the adverse possession of various Leone families.[1]

---

[1] Litigant To`omata M.T. Tuitele, claiming to appear on behalf of himself and the heirs of To`omata and Tali, is hard to characterize as a plaintiff or defendant. To`omata and Tali are the other two people to whom (along with Amelia Va) Talamaivao is said to have given Lega`oa. Thus a victory for plaintiff Willis and the heirs of Va, awarding the full 297 acres to the three legatees and their descendants, would seem to be a victory for To`omata as well. To`omata is also, however, a chief of Leone, as was his ancestor of the same name who received the legacy from Talamaivao. The present To`omata first appeared in this litigation as an objector to the attempted registration of the whole 297 acres as property of the heirs of Va. After the cases had been consolidated, counsel for To`omata filed a three-sentence answer from which it is not possible to discern a theory of the case. In determining the order in which evidence should be presented, the Court ordered without objection that To`omata should

At the suggestion of counsel for plaintiffs and without objection from any party, the Court ordered a bifurcated trial. The first hearing would concern all events up to and including the 1918 High Court case. It was anticipated that much of the evidence at this hearing would be documentary, with live testimony serving primarily to authenticate and explain old land grants, judicial decisions, surveys, and so forth. The Court would then issue an opinion dealing with plaintiffs` primary claim: that as a result of the 1906 and 1918 High Court decisions and events that led up to them, Va, Tali, and To`omata were in 1918 the co-owners of land called Lega`oa roughly defined by the 297-acre survey.

The second hearing would concern events since 1918. It was anticipated that this hearing would have to do primarily with claims based on adverse possession. Most of the defendants had asserted such claims, which would become important if and only if plaintiffs should prevail on the threshold questions to be resolved after the first hearing.

The first hearing began on December 1, 1988. The first day was consumed with the introduction of exhibits, the testimony of plaintiffs` surveyor, and the testimony of plaintiff Tony Willis. The Willis/Va plaintiffs then rested. The next day, however, the Court heard from plaintiff Tony Willis again, this time as a witness for plaintiff Levi. This testimony did not have to do with issues uniquely relevant to the Levi claim (which is based on an assignment from an heir of Amelia Va) but consisted largely of reiteration and elaboration of what plaintiff Willis had told the Court the day before. The Court then heard from the final plaintiff, To`omata.

After all plaintiffs had rested, we granted a motion to dismiss.

Our order of dismissal did not dispose of all claims by all parties, but only --- in keeping with the arrangement for a bifurcated trial --- of

---

be characterized as a plaintiff. His testimony with regard to the historic boundaries of Lega`oa, however, turned out to be in substantial agreement with the position taken by most of the defendants.

plaintiffs' claim that Amelia Va, Tali, and To`omata were co-owners of Lega`oa (as defined by the 297-acre survey) as a result of the 1906 and 1918 High Court cases and an associated "compromise."

We held that the 297-acre survey reflected not the <u>award</u> to To`omata in the 1906 case, but the entire extent of his original <u>claim</u>. The 1906 decision awarded To`omata only a fraction of what he had claimed. The Court first held that Lega`oa included only flat land and no mountains, then divided the flat part of Lega`oa in two and awarded only half to To`omata. <u>To`omata v. People of Leone</u>, 1 A.S.R. 142 (1906). The 1918 decision recognized that To`omata was not a sole proprietor but a co-tenant with Tali and Va. <u>Falesau v. Tuitele</u>, 1 A.S.R. 298 (1918).

Plaintiffs had offered their survey, a retracing of the 297-acre survey apparently prepared for To`omata in 1906, as the map of what To`omata, Tali, and Va owned <u>after</u> the Court decisions had denied most of their original claim. We held, on the contrary, that the Court had awarded those three persons only the back half of the flat portion of plaintiffs' survey.

Plaintiffs now move for reconsideration of our order dismissing their claim to ownership of all the land encompassed in the 297-acre survey. We deny the motion, believing the facts and the law to be consistent with the opinion and order announced from the bench.

### Facts

1) At some time prior to 1852 Talamaivao Saisaofai, a chief of Upolu, began to claim certain lands on the island of Tutuila in the vicinity of the village of Leone. Plaintiff Tony Willis testified that Talamaivao had been given these lands by Malietoa. An earlier Talamaivao family tradition is that Saisaofai's ancestor Ulualofaiga saved the life of a great chief of Upolu called Fonoti. According to this tradition, Fonoti then declared Ulualofaiga to be a togiola (life-giver or saviour) and gave him the Tutuila land as a reward.

2) In 1852 Saisaofai sold Matthew Hunkin a tract of land in Leone. Hunkin paid "One hundred dollars (or its value [in] pork)." Matthew Hunkin,

also known as Mataio, settled in Leone at some time during the 19th century and became the progenitor of a prominent family of that village and its environs. The tract he purchased was described in the deed of sale as "Lepule with its `Tuafanua.'"

3) Lepule (sometimes written as Le Pule or le Pule) is a small tract of land near the center of the village of Leone, at some distance from the lands presently in dispute.

4) The term Tuafanua (or tua fanua) means "back lands." It was a generic term used to describe the unsettled and uncultivated land, if any, behind a tract of settled or cultivated land. Samoan land owners often regard their property rights as extending not only over the land they actually occupy, but also over any unoccupied land extending behind them to the mountains and forward to the ocean reef.[2] The most logical construction of the term "Lepule with its `Tuafanua'" in a deed of sale would be that the buyer acquired the tract called Lepule, together with whatever rights the seller would have had to cultivate the adjacent bush. As is further discussed below, however, by around 1900 the term "Tuafanua" was being used as a collective term for various tracts of land to the mountain side of the village of Leone.

The 1895 Decision of the Apia Court

5) In 1894 Matthew Hunkin's executors sought confirmation by the Samoan Land Commission in Apia

_____

[2] We take judicial notice of this attitude only for the purpose of understanding the term "tuafanua." We do not hold that it has the force of law in this or any other case. The current law of American Samoa is that an individual or family that clears and cultivates virgin bush can acquire a property right in the land, notwithstanding its proximity to other land that has previously been occupied or cultivated by others. See Leuma v. Willis, 1 A.S.R.2d 48, 49-54 (1980), and authorities cited therein; Lago v. Mageo, 4 A.S.R. 287 (1962), and authorities cited therein; A.S.C.A. § 37.0101. See also Lago v. Mageo, supra, at 299-302 (land below the high-water mark is held by the United States in trust for all the people of the Territory).

of his claim to "`Lepule' & its `Tuafanua' adjoining it." They based their claim on the 1852 purchase from Saisaofai.

6) A person named Iulio, sometimes calling himself Talamaivao Iulio, was the only objector to the Hunkin claim. He objected not to Hunkin's claim to Lepule itself, but only to "its Tuafanua." Iulio's objection was signed and apparently prepared by "Natives' Advocate" E.W. Gurr. The stated reason for the objection was "Fact of sale is disputed."

7) Iulio was a son of Talamaivao Saisaofai. He was also the half-brother of Talamaivao Lei, who was (at least from 1895 until 1910) the holder of the Talamaivao title. Iulio was a catechist from Upolu who spent a good deal of time in Leone. He sometimes claimed to be the true holder of the Talamaivao title, and he sometimes also claimed to be the individual owner of the Talamaivao or Saisaofai lands in Leone. It is clear, however, that in the trial against Hunkin he was acting as agent for Talamaivao Lei. See Exhibits 6 (letter from Iulio to Misitea dated 12 March 1906 re land Le Gaoa, from record of LT 5-1906) and 12 (letter from Iulio to Misitea dated 12 March 1906 re land Le Pala); see also Iulio v. Talamaivao, No. 6-1910, 1 A.S.R. 217 (1910).

8) The Land Commission confirmed Hunkin's claim to Lepule but rejected his claim to the Tuafanua. The Land Commission's decision with regard to the Tuafanua was limited to a rejection of Hunkin's claim. It did not purport to declare Iulio or anyone else to be the owner of the disputed lands. Exhibit 2; see also Iulio v. Talamaivao, supra, 1 A.S.R. at 220 ("[T]his Court is convinced that it [the Land Commission] merely rejected or recommended the rejection of the petition of the foreign claimant for a court grant.")

9) Alfred Hunkin appealed to the Supreme Court of Samoa, sitting at Apia, from the decision of the Land Commission. The appeal was heard in 1895. Alfred Hunkin was the part-Samoan son of Matthew Hunkin and was one of Matthew's executors. He was also, at all times relevant to the 1895 and 1906 proceedings, the holder of the title Fai`ivae in Leone.

10) Fai`ivae Alfred Hunkin claimed on appeal --- contrary to his original claim before the Land Commission --- that "the Tuafanua" which he had purchased from Saisaofai included various lands that did not directly adjoin Le Pule but were in back of the village of Leone. He said there were about a hundred parcels of land included in the Tuafanua of Leone, but that he laid claim to only fifteen. These fifteen parcels, he said, were in addition to three that had "already been confirmed to me." According to his testimony, these three parcels had been awarded to him in a previous proceeding in which he had claimed all 100 pieces of the Tuafanua of Leone, including the nearby village of Amanave. In the 1895 proceeding he specifically disavowed any claim to Amanave.

11) Seven of the fifteen parcels claimed by Hunkin in the 1895 appeal were in a portion of the Tuafanua called Lepala or le Pala ("the swamp.") The remaining eight parcels were in another portion of the Tuafanua called Lega`oa, "about 1 $1/2$ miles from Leone." The dimensions of Lega`oa were "about in width from the court house to Blacklock[3] and about the same distance in lengths." Hunkin had originally estimated the size of his entire claim, including at least Lepule, Lepala, and Lega`oa, to be 50 acres (Exhibit 2). In his testimony he estimated that his entire claim was about 100 acres (Exhibit 5).

12) The Supreme Court denied Hunkin's claim to the aforementioned 15 parcels of the Tuafanua. Hunkin v. Iulio, Rehearing of Claim No. 2791, Supreme Court of Samoa, decided September 10th, 1895.

---

[3] The Court is of the opinion that it can take judicial notice that the Court House and Blacklock's store (later Parkhouse & Brown's store) were both located in downtown Apia. See Cyclopedia of Samoa at 27, 99, 110 (1910). If Hunkin's estimate was correct, the land called "Lega`oa" involved in the 1895 case therefore constituted only a few acres. Such a finding, however, is unnecessary to our decision; it is sufficient that the evidence establishes Hunkin's entire claim to have comprised only 50 to 100 acres. See also Conclusion of Law No. 1, infra.

13) It is difficult to discern the precise grounds for the 1895 opinion, or even what the court thought it was deciding. Hunkin's claim had been to "'Lepule' & its 'Tuafanua' adjoining it" (Exhibit 2; see also Exhibit 1, the 1852 deed). The most obvious ground for the court's rejection of Hunkin's claim to any "Tuafanua" was that by 1895 there was no unsettled back land adjoining Lepule. All adjacent tracts had been sold and occupied by others. See Exhibits 5 and 6. Although Hunkin may well have cultivated other lands behind Leone in an area known as "the Tuafanua of Leone," any rights he may have had to such lands would seem to have been unconnected to his purchase of "Lepule and its Tuafanua." In any case such rights were not put at issue by his claim before the Land Commission to "'Lepule' & its 'Tuafanua' adjoining it." (Exhibit 2, Description of Land, emphasis added.)

14) The Apia court appears, however, to have addressed matters not raised by the appeal that was before it. It "confirmed by ten years occupation and cultivation undisputed" Hunkin's ownership of Onu'uolupe and Pagaloa (Pugaloa) although he had not claimed them. (Exhibit 6.) Perhaps these were among the three parcels he said had already been confirmed to him, or perhaps they were parts of the larger tracts Hunkin called Lepala and Lega'oa. (The record of Hunkin's testimony, Exhibit 5, is ambiguous: Pugaloa may be the name of one of the fifteen parcels claimed by him, but seems more likely to have been the name of the land immediately to the west of that parcel.)

15) The scope of the 1895 decision of the Apia court is further confused by what appears to have been an unofficial record prepared by "Misikea, Councillor for Samoa." Misikea (sometimes written Misitea) is a Samoan transliteration of "Mister Gurr." This was the same E.W. Gurr who had appeared for Iulio before the Land Commission. Gurr's undated note (Exhibit 8) was found in the record of Iulio v. Talamaivao, supra, a 1910 case having to do with the ownership of the village of Amanave. It varies in several ways from the official report of the Apia case. First, it states that the appeal was heard on September 10, 1896; the official record is dated September 10, 1895. (The latter date is corroborated by a letter Gurr himself wrote a few days after the proceeding. See note 4, infra.) Gurr's caption for the case is

131

"Amanave, Lepule & its backgrounds"; the official documents (Exhibits 2, 3, and 6) speak only of Lepule and its backgrounds. In Gurr's version of the decision the Court "restored" the rights of "Iulio and his family" to "the town Amanave, & the land Lepala, & the land Legaoa, & other lands of the background of Lepule that is left." The official report signed by the clerk (Exhibit 6) does not mention Amanave and does not mention any award or "restoration" of rights to Iulio. Gurr's report, on the other hand, omits any mention of the court's affirmation of the rights of landowners adjacent to Lepule, which the official report does mention. The pattern of variations from the official report, and the error regarding the year in which the appeal was heard, strongly suggest that Gurr's note was not a contemporaneous record of the 1895 case but was prepared in anticipation of a 1906 case having to do with Amanave, in which it was Iulio's principal exhibit. See Iulio v. Talamaivao, supra, 1 A.S.R. at 219. In any case it appears that Gurr, denominated "Natives' Advocate" in Iulio's objection before the Land Commission and "Councillor for Samoa" in his own letters describing the Apia court case, was acting throughout as an advocate for Iulio.[4]

_____

[4] Gurr also wrote a letter in 1895 to the "Chiefs and Councillors of Amanave," telling them that Iulio had "put before the judge an objection to protect your town & cultivations & also land." He informed the chiefs that "the Case is now over & the town Amanave & its lands are saved." The only hitch, according to Gurr, was that "you [the chiefs of Amanave] are to pay taxation for the investigation of the land, the sum of one hundred dollars, then your land will be saved." Otherwise the Chief Judge and the Government would "be at a disposal of selling your land to whom they choose." Gurr suggested that each resident of Amanave contribute two or three dollars. The letter was signed "Misitea, Councillor for Samoa" and was dated September 16, 1895, six days after the Apia trial. The chiefs later claimed that they had paid the $100 to Iulio. (Gurr's letter to the chiefs and the chiefs' claim to have paid the money to Iulio are part of the record of Iulio v. Talamaivao, supra.)

The official report of the Apia case,

132

## The 1906 High Court Case

16) On March 12, 1906, several years after the cession of Tutuila to the United States, Iulio wrote a letter to the Secretary of Native Affairs and Registrar of Titles and Lands for American Samoa. It appears from the letter that these two offices were combined in one person, who was none other than the aforementioned Misikea or E.W. Gurr. The letter seems to have been intended to operate as a deed of conveyance. In it Iulio announced:

a) that eleven years previously he had been awarded "the back land of Lepule in Leone" [O le Tuafanua o le Pule i Leone] by the Land Commission;

b) that "this back land is called Lega`oa";

c) that Iulio and Talamaivao have agreed to give the land to To`omata and Tali and Amelia Va-- - "in her [Amelia] and her children . is the true ownership [pule], because Amelia is the wife of Talamaivao and the daughter of Tuitele; this is our paolo [family connection] to Tuitele, this our true family."

d) "The true ownership of Lega`oa will be in Amelia and To`omata and Tali forever, without any disturbance from our family or our children."

e) The text concludes with the following sentences: "Also all the lands of the foreigners and missionaries, the true ownership is in them, because these lands have all been registered with the government in years gone by, because of fa`ataufua [sales that were invalid or

---

contrary to Gurr's letter, assesses $100 not against the chiefs of Amanave but against Iulio himself. Moreover, the assessment appears on its face to have to do with "all the rest of the Tuafanua" --- that is, such portions of "the Tuafanua of Lepule" as were not confirmed to Hunkin --- rather than with Amanave in particular. Assuming that "Councillor for Samoa" was something other than a self-description, and whatever the official duties of that post might have been, it is difficult to escape the conclusion that Gurr was operating as an advocate for Iulio.

unauthorized] by some chiefs of Leone. These lands are within le Ga`oa, but pieces of land are with the chiefs of the village of Leone. Amelia Va and her whole family are the true owners forever."

f) The letter is signed "Iulio." Below this signature are other signatures purporting to be those of Talamaivao, "Sasafai," To`omata, Talita`ua (Tali), and Amelia.

17) On or about the same day that Iulio wrote as recounted above to the Registrar about the land he called Le Ga`oa, he undertook to sell the proposal to certain chiefs of Leone by promising them gifts of land. To Le`oso he wrote that if Le`oso would "testify to Talamaivao's pule over Lega`oa . . . your lands in Lega`oa will remain." Iulio also hinted that it was futile to fight Talamaivao in court, reminding Le`oso that when Fai`ivae had tried this in 1895 he had lost badly. Meanwhile, however, Iulio appears to have written Fai`ivae a letter of which we have no record; we do have a terse letter from Fai`ivae to Iulio, dated March 12, apparently rejecting an offer and making a counter-offer: "If there is no land around Le Pala, then in my opinion it would be useless for you to give my family any land or share in Le Gaoa." (The evidence also includes a blank form dated March 1906, purporting to be a letter from Talamaivao and written in a style similar to that used by Iulio in his other letters, by which Talamaivao would "give the land Le Pala to the Faiivae family at no cost to be Faiivae land forever." The form is not signed by anyone, and was apparently never executed. But there is a letter dated March 12 from Iulio to Gurr in his capacity as registrar of land titles, stating the intention of Iulio and Talamaivao to give Le Pala to Faiivae and agreeing to have the property registered in Faiivae's name.)

18) Instead of supporting Talamaivao's proposal to register Le Gaoa as the land of To`omata, Tali, and Va, neighboring chiefs registered their objections. On March 12 the Western District Governor wrote to Gurr (this time in his capacity as Chief District Judge) "because I have heard that Talamaivao is going to register with the government the name Legaoa. . . . and . . . everyone has a piece of land there." On March 13 Fai`ivae objects that his land "Lefega" is in Legaoa. (Fai`ivae identifies himself as Western

District Governor, but the handwriting of the two letters described above differs markedly.) On March 14 Leone chiefs Salave`a, Samaga, Tuiteleleapaga, Toilolo, Suafo`a, Su`a, Tavai, Talava, Puloto, Aigamaua, Uo, and Iuli wrote to object to "what Talamaivao has done to the nu`u [village, district, or people] of Le Gaoa" and listing their lands within Lega`oa.

19) On or about March 27, 1906, it appears that Iulio or To`omata filed the 297-acre survey with Gurr. The survey is dated March 27, 1906 and purports to be "Le Ga`oa, land of To`omaata, Leone." The original is contained in the High Court file for Land and Titles case No. 5-1906.

20) On March 28, 1906, Le`oso wrote to Gurr--- addressing him as "Chief Judge" --- objecting to "Iulio and Talamaivao's survey [fua]." Significantly, this is the first mention of a "survey." Objectors who lodged their objections prior to March 27 spoke of what they had heard, or of a proposed registration, or of "what Talamaivao is trying to do." We conclude that the 297-acre survey must have been given to the Registrar, or at least made public, on or about the date on its face, March 27, 1906.

21) It is clear from the two surveys and from the testimony of plaintiffs' surveyor that the 297-acre survey dated March 27, 1906, and the 1988 retracing designated "Legaoa 1906" on Exhibit 18 are substantially identical. These are also substantially identical to the Willis/Va plaintiffs' survey submitted for registration in LT No. 45-81, one of the cases now before us.

22) Lega`oa as defined by the three surveys mentioned above is bounded on the east, north, and west by mountain ridges or slopes. It is bounded on the south by a stone wall and by land called Pugaloa or Pagaloa. Much of the land in the eastern and northern portions of this tract, and some of the land in the western portion, is mountainous. The southern and southwestern portions, and much of the area in the center of the survey, are flat land.

23) The evidence establishes that the following tracts, some of which were registered as freehold land prior to 1906, are within plaintiffs' survey: the "Sisters' Land"; Fai`ivae land called

Lefega; Le`oso land called Lesolo; Uo land called Leifi; and two tracts called Lepala, out of at least three by that name in the vicinity. The evidence establishes that the following lands are outside the survey: Hunkin's land called Pugaloa; Hunkin's land called Lepule; Lalopua; and the French Roman Catholic Mission. These lists are not exhaustive of the tracts within and without Lega`oa, but only of the lands of whose location plaintiffs submitted sufficient evidence to allow us to make a finding.

24) Of the lands listed above, all but one of those within plaintiffs' survey were listed by objectors to the proposed Iulio/To`omata registration as being within Lega`oa: Lefega, Lepala, Lesolo, and Leifi. Only the "Sisters' Land" was not part of the dispute. Of the lands we find to be outside plaintiffs' survey, none was listed as a source of objection in 1906.

25) The trial was held on May 3, 1906. Presiding was E.W. Gurr, Chief District Judge. All witnesses testified that the boundaries of Lega`oa were substantially those stated in our description of the 297-acre survey, except that some witnesses testified that Lega`oa included only flat land. In particular, Talamaivao testified that the seaward boundary of Lega`oa was Pugaloa.

26) At trial a number of Leone chiefs testified that they had long had plantations within the area being offered for registration by Talamaivao on behalf of To`omata.

27) The Court announced its decision at the conclusion of trial. It held that "[t]he land named Lega`oa is the flat land below the mountain." It ordered that the land be divided in the middle. The inland portion was to be that of To`omata and the seaward portion the property of "the Leone people whose names are now recorded." The Court also announced that "Leoso will get the two lands Togiagogo and Lesolo that are situated on the sami side of Legaoa."

28) In a written decision dated May 4, 1906, the Court held that "the property in controversy LEGAOA is defined to be the flat land of the valley before the rise to the hills surrounding"; that it was the property of To`omata by gift of Talamaivao but had long been occupied by others, who were

136

entitled to compensation for their improvements; and that Legaoa should be divided equally as stated above. To`omata v. People of Leone, 1 A.S.R. 142 (1906).

29) It is absolutely clear that the court was defining Lega`oa as "the flat land of the valley" within the survey that had been offered for registration. There is no evidence at all to support the alternative hypothesis offered by plaintiffs, that Lega`oa originally consisted of the entire Leone valley and that the 297-acre survey reflects the portion that was awarded to To`omata in the 1906 case. And there is abundant evidence to the contrary: (a) The 297-acre is dated March 27, 1906, before rather than after the trial. (b) From the first mention of Lega`oa in 1895 it is described as among the "back lands" behind the village of Leone. (c) In 1906 the objectors were obviously unhappy with Talamaivao and Iulio, but no one alluded to an attempt by Talamaivao or Iulio to register the entire Leone valley. Such an event would have been a remarkable event in the life of the village of Leone; if Talamaivao had attempted to register the whole valley including the central village, it is inconceivable that the chiefs' objections would have mentioned only some backlands toward the mountain. (d) On the contrary, however, every land which any objector claimed to be part of the original proposed registration, and of which we have any evidence at all, has been shown to be part of the 297-acre survey. (e) At trial Talamaivao himself testified that Pugaloa --- not the ocean or anything near the ocean --- was the seaward boundary of Lega`oa. Pugaloa is also the southern boundary of the 297-acre survey and of plaintiffs' current survey. (f) Finally, the Court itself alluded to the location of Lesolo "on the sami [seaward] side of Legaoa." Lesolo is in the sami portion of the 297 acre survey (see Exhibits 18 and 29) but it is nowhere near the sami side of the Leone valley.

On plaintiffs' hypothesis that the tract called "Lega'oa" consisted of the entire Leone valley before the Court divided it in two, everyone involved in the case --- Talamaivao, the objectors, the Court itself --- was badly confused about the tract's location and its boundaries. On the contrary hypothesis, that Talamaivao and To`omata attempted to register only the 297- acre survey, all the evidence makes sense. The flat land within

137

the 297-acre survey --- a survey substantially identical to the one now offered by plaintiffs as "their" portion of Lega`oa --- was what the Court in 1906 ordered to be divided between plaintiffs' ancestors and defendants' ancestors.

30) The flat portion of the 297-acre survey is substantially identical to the 60.1 acres marked "Lot A" on plaintiffs' Exhibit 36. This is the area that was ordered to be divided in two, the inward portion to belong to To`omata and the seaward portion to the chiefs of Leone whose cultivations had been within Lega`oa.

### The 1918 Case

31) By 1918 To`omata had acquired the Tuitele title. Two of the children of Amelia Va sued him, urging that he had made unauthorized sales of parts of the land belonging partly to their mother.

32) Although the Court found the children had no standing so long as Amelia Va lived, she appeared at the trial and the Court issued a judgment on the merits.

33) The Court's judgment was that "the title to the land in controversy is vested in TO`OMATA, now known as TUITELE, TALI and AMELIA VA, as tenants in common, each of these persons having an equal interest in the same."

34) In a finding or preamble preceding the above judgment, the Court stated that "[t]he portion of the land "LEGAOA", which was given by this deed to AMELIA VA alone was by the High Court, in said case [i.e., the 1906 case], awarded to the people of Leone." This finding was apparently based on a letter from E.W. Gurr explaining the 1906 Court's decision.

35) We believe the letter from Gurr, and the 1918 Court's finding, to be based on a misconstruction of the deed. The deed is in the record of LT No. 5-1906 and its principal parts are stated in paragraph 16 supra. We do not find any evidence of an intention to give any part of Lega`oa to Amelia Va alone; rather, the deed says in one place that "in her is the true ownership of the land," because she is the connection between the Talamaivao and the Tuitele families. Nevertheless, in two other places the deed speaks

138

of the "true ownership" belonging to To`omata, Tali, and Va jointly. Judge Gurr in his letter to the Court in 1918 apparently tried to resolve the conflict by reading the last sentence of the deed as a gift to Amelia Va alone of lands that were "with the chiefs of Leone." We do not think that is what the deed says.

36) To`omata and Tali were close relatives of Amelia Va. In 1906 the High Court had already declared To`omata the heir apparent to the Tuitele title. In re Matai Title Tuitele, 1 A.S.R. 25 (ca. 1902). The stated purpose of the 1906 transfer was to illustrate and strengthen Iulio's and Talamaivao's paolo [family connection, but also "shade" or "protection"] to the powerful Tuitele family. The apparently conflicting terms of the deed --- one sentence that appears to give the "true" ownership of the land to Amelia Va, while the rest of the deed gives ownership to her "whole family" or to the three named persons --- make sense in this light. The brothers Talamaivao were giving the land to To`omata et al. because of Amelia Va, and so were giving it "truly" to her and also to the whole family.

37) Our difference of opinion with the 1918 Court on this question of fact is, however, moot. Despite its view that Talamaivao had intended to give Amelia Va certain lands separately and that those lands had been awarded to the chiefs of Leone in 1906, the Court concluded that she was an equal co-owner with To`omata and Tali of the portion of Lega`oa that had been awarded to them.

38) Plaintiffs' counsel has alluded to a missing deed, and sometimes to a second deed. We have no evidence that there was ever any deed other than the one described in paragraph 16 supra. Although we believe Judge Gurr's 1918 letter (contained in the record of the 1918 case) to be an incorrect interpretation of the deed that is before us, its structure strongly suggests that it is an attempt to construe this deed rather than some other or others.

39) Nor have we any evidence of a "compromise" subsequent to the 1906 case, whereby the chiefs of Leone awarded Amelia Va any additional lands in compensation for what she lost in the 1906 litigation.

### Conclusions

1) Although we assume for the purpose of this motion that the 1895 decision of the Apia court is binding on us, it has no bearing on the outcome of this litigation. The only issue properly before the Court was Alfred Hunkin's appeal of the denial of his father's claim to "Lepule and its `Tuafanua' adjoining it." The land in dispute in the present case clearly does not adjoin Lepule. Even if we are bound by what the court seemed to think it was deciding --- the denial of Hunkin's expanded claim to an area of 50 to 100 acres in the backland of Leone, <u>part</u> of which he called Le Ga`oa --- the official record of the decision purports only to reject Hunkin's claim and not to confirm that of Iulio as against the world. Moreover, even if Iulio had won Hunkin's eight portions of the backland called "Le Gaoa" in 1895, we would have no evidence of how much of the 297-acre survey was included in those tracts. Finally, the far more specific ruling of the High Court of American Samoa in 1906, which did define the rights in Lega`oa of the Talamaivao legatees and of the Leone chiefs, would seem to supersede any contrary implication of the earlier Apia decision.

2) The High Court in 1906 held that Lega`oa consisted of the flat land within the 297-acre survey that had been offered for registration. The Court ordered that the land be divided into two equal parts, with the back portion belonging to To`omata and the seaward portion to the chiefs of Leone whose cultivations had been within the survey. <u>To`omata v. People of Leone</u>, <u>supra</u>. In 1918 the Court held that To`omata had not been awarded the land as a sole proprietor, but that he was a tenant in common with Tali and Amelia Va. <u>Falesau v. Tuitele</u>, <u>supra</u>. These holdings are binding on us and on the parties to the present case by the rule of <u>res judicata</u>.

3) Much of plaintiffs' argument on rehearing was devoted to urging that we had misapplied the standard of proof on a motion for summary judgment. But the motion we granted was not a motion for summary judgment. It is true that at the conclusion of the plaintiffs' evidence, the Court announced that it would hear arguments on a motion for summary judgment that it had previously deferred until trial on the merits. When, in response to this announcement, plaintiffs' counsel

140

argued that the Court would have an obligation to find the facts in the most favorable possible light for plaintiffs, the Court asked if defense counsel wished to make a motion to dismiss. Defense counsel did make a motion to dismiss, and argument resumed on that motion. The motion was in order, plaintiffs having rested and defendants not having put on any evidence.

4) The standard of proof on a motion to dismiss at the conclusion of plaintiffs' evidence at trial, unlike the standard on a motion for summary judgment prior to trial, is that plaintiffs must prevail by a preponderance of the evidence.

> The court is not to make any special inferences in the plaintiff's favor nor concern itself with whether plaintiff has made out a prima facie case. Instead it is to weigh the evidence, resolve any conflicts in it, and decide for itself where the preponderance lies.

> 9 Wright & Miller, Federal Practice and Procedure: Civil § 2371 at 224-25 (1971).

At the conclusion of the plaintiffs' case the Court would have been justified in treating the case as though defendants had rested without submitting any evidence. As it happened, the clear contemporaneous evidence of what happened in 1906 --- almost all of it offered by the plaintiffs and much of it from the Court's own files --- and the testimony of plaintiffs' own surveyor about the current location of the various tracts discussed by the parties and the Court in 1906 and earlier, far outweighed the slight contrary evidence. This consisted almost exclusively of the testimony of plaintiff Tony Willis to the effect that his family had once owned all of Leone and had been consigned to the 297 acres of plaintiffs' survey after "the first illegal division of the land" by the High Court in 1906.

The Court, moreover, did far more than what was strictly necessary to ensure plaintiffs a fair hearing. First we allowed plaintiff Tony Willis to testify for a second time at the request of counsel for plaintiff Levi, although we had heard plaintiff Willis for several hours the day before and counsel for plaintiff Levi had previously had the opportunity to question him. Then, having noted that the

testimony of plaintiff To`omata --- technically a plaintiff since his claim was derived through the 1906 conveyance from Talamaivao --- was more helpful to defendants than to plaintiffs, the Court decided to disregard this testimony in reaching a decision on the motion to dismiss. Finally, in response to the argument of plaintiffs' counsel that he had been saving certain evidence for rebuttal, the Court heard plaintiffs' offer of proof and agreed to assume the truth of every bit of the proffered evidence in reaching its decision on the motion to dismiss.

Plaintiffs had a fair trial. Plaintiffs' counsel did an excellent job. They simply did not have much of a case. At the close of the plaintiffs' evidence it was quite clear that defendants should prevail on the only issue before the Court, and that neither the Court nor any party would benefit from another two days of testimony.

The Land and Titles Division of the High Court is specially authorized by statute, in cases where "the strict compliance with any rule of practice or procedure may be inequitable or inconvenient," to act "in such manner as it considers to be most consistent with natural justice and convenience." A.S.C.A. § 3.0242. Although we feel that the procedures we followed were correct even in the absence of this statute, we reaffirm our conviction that justice and convenience would have been disserved by requiring the many defendants in this case to present evidence and arguments in the slim hope that the plaintiffs' case would be struck by the evidentiary equivalent of lightning.

5) For the purpose of the motion to dismiss we agreed to assume that the United States Government established a rifle range in the seaward half of the 297-acre survey during World War II. Tony Willis testified that his mother received a damage award from the government after the war on account of the rifle range; he also submits documentation of an award, which does not mention whether it was on account of a rifle range. We assume, however, that it was. We also assume the truth of testimony that plaintiffs' counsel said he would have offered on rebuttal, to the effect that Dorothy Asuega, an heir of Amelia Va, has lived in the seaward portion of the 297-acre survey; and that aerial photographs of Lega`oa and vicinity taken during the last

142

twenty years or so would not show clear boundary lines between a number of small cultivated tracts.

This evidence might be relevant to a claim based on adverse possession, which is not now before us. We understand also that relatively recent patterns of occupation are not altogether irrelevant to what the Court might have done in 1906. These three pieces of evidence, however, and Tony Willis's testimony with regard to his version of Talamaivao family history, are insufficient to overcome the clear contemporaneous documentary evidence of what was before the Court in 1906 and what the Court then decided.

6) Finally, with regard to the mountainous portion of plaintiffs' survey we are bound by the rule of res judicata to the holding of Leuma v. Willis, 1 A.S.R.2d 48 (1980).

> The land is not the individually owned land of Defendant [Tony Willis, plaintiff in the present case]. . . . We have found that Willis [the same Tony Willis who is a plaintiff in the present case] and his co-tenants were deeded only the flat land of the valley. Since we have found that the land in question is not part of the flat land of the valley, Willis cannot claim this land by the deed, whether or not the deed is valid.

Id. at 55.

This does not, of course, preclude plaintiff Willis or any other party from proving a claim based on original occupation or on adverse possession. Those issues, by stipulation of the parties, are not presently before us.

Order

We reiterate our judgment from the bench. The amended complaint of the Willis\Va plaintiffs in consolidated cases 45-81 and 45-82 is dismissed, and all the relief demanded therein is denied with prejudice, except that the following declaratory judgment will issue:

> The inland half of the flat portion of the 1906 To`omata survey of Lega`oa, more particularly identified as the inland

half of Lot A on Plaintiffs' Exhibit 36 in the present case, is the individual property of the successors in interest of To`omata, Tali, and Amelia Va, who held equal interests in the land as tenants in common. The seaward half of the same survey, more particularly identified as the seaward half of Lot A on Plaintiffs' Exhibit 36, is the communal property of those families of Leone who were occupants prior to 1906 of any part of the land described by the survey. This judgment is without prejudice to the rights of any person who has acquired a title to any portion of the described land by registration in accordance with law, or by adverse possession.

The Court will hold a second hearing at the convenience of the parties in order to resolve any claims by adverse possession, to allow the various defendants to prove their claims within the seaward half of the survey, to consider any claims within the mountainous portion of the survey, and for other purposes not inconsistent with this decision. All claims in cases LT No. 8-84, LT No. 22-86, and LT No. 6-87 are also deferred until the second hearing, to be resolved consistently with this opinion and the judgment herein.

The motion to reconsider is denied. It is so ordered.